595 So.2d 1335 (1992)
UNION MORTGAGE COMPANY, INC.
v.
Willie Mae BARLOW and Willie J. Galy.
1901350.
Supreme Court of Alabama.
January 10, 1992.
Rehearing Denied March 6, 1992.
*1336 Robert A. Huffaker of Rushton, Stakely, Johnston & Garrett, P.A., Montgomery, James D. Turner and Albert G. Lewis III of Turner & Turner, P.C., Tuscaloosa, and Jerry J. Strochlic and Jeff H. Galloway of Hughes Hubbard & Reed, New York City, for appellant.
Edward L. Hardin, Jr. and Maston E. Martin, Jr. of Hardin, Tucker & Martin, Birmingham, and John A. Taber and Earl *1337 L. Dansby of Taber and Dansby, Montgomery, for appellees.
PER CURIAM.
This is an appeal from a judgment on a jury verdict in favor of the plaintiffs, Willie Mae Barlow and Willie J. Galy, in the amount of $6,153,000. The case raises questions of whether there was a prejudicial failure of prospective jurors to accurately answer questions on voir dire; whether the verdict failed to follow the court's instructions or was inconsistent; whether the evidence supported the verdict; and whether the award of punitive damages was excessive or otherwise improper.
The plaintiffs sued Union Mortgage Company, Inc. ("Union Mortgage"), American Home Improvement Services of Alabama ("American Home"), and Ronald Sellers, president of American Home, alleging fraud, conspiracy, and breach of contract relating to a home improvement loan; they requested damages in the amount of $4,500,000. A suggestion of bankruptcy by Ronald Sellers, doing business as American Home, was filed, and the action against Union Mortgage was severed from the action against American Home and Sellers. Union Mortgage filed an answer denying the plaintiffs' claims and asserting the affirmative defenses of estoppel and in pari delicto. Union Mortgage also filed a counterclaim for $6,250,000, alleging that the plaintiffs had committed fraud, conspiracy, and breach of contract.
The facts and arguments in this case are lengthy. Therefore, it is necessary to briefly describe the parties and their roles in the home improvement loan at issue in this case.
American Home was principally in the business of performing home improvements. The evidence would support a finding that American Home performed home improvement contracts on credit only if Union Mortgage agreed in advance to lend the homeowner money for the repairs, with the loan secured by a mortgage on the house. The evidence showed that Union Mortgage actually approved the loans and that it took an immediate assignment of the mortgages at a substantial discount plus a fee. Neither the discount nor the fee was disclosed to the mortgagor. Union Mortgage then sold these mortgages to other financial institutions for substantially more than the discounted credit that it had actually extended.
Willie Mae Barlow, a woman living in Hayneville, Alabama, applied for and obtained such a loan for an amount substantially larger than the value of the improvements for which the loan was supposed to be used. As part of the transaction, she executed a deed conveying her house to herself and her son Willie J. Galy, whose income was required for approval of the loan and who joined her in executing the mortgage. Barlow had five other children, and she testified that she would not have deeded her property to her son Galy if she had been informed of the effect of the document she was signing.
The plaintiffs presented two alternate theories of relief at trial as to the fraud claim. First, the plaintiffs claimed that Union Mortgage had committed fraud through American Home as its agent.
The plaintiffs argued that all the documents reflected that credit was being extended to the homeowner by the contractor, such as American Home, for home repairs. They contended that the home repairs were worth substantially less than the amount of the loan. According to the plaintiffs, the contractor immediately assigned the mortgage to Union Mortgage. Union Mortgage then "chopped" a percentage off the face amount of the loan. Union Mortgage told the contractor the amount of the discount but did not tell the customer. The plaintiffs claimed that Union Mortgage made its money from the discount and the profit from the subsequent sale of the mortgage. The contractor, they contended, made money from the inflated price of the home repairs. The result for the customer was that she owed money on a home improvement loan for which she did not receive the full value of the loan. The plaintiffs argued that Union Mortgage devised this scheme to commit fraud against all its customers and had been committing fraud *1338 since its formation in 1982. They note that Union Mortgage and American Home had engaged in 84 similar transactions in Alabama.
Second, the plaintiffs argued that Union Mortgage had committed fraud directly against its customers. The plaintiffs contended that Union Mortgage was the primary lender and, as such, should have disclosed the "chop" or discount to the customer. The plaintiffs argued that Union Mortgage was the primary lender because it made all of the credit decisions and actually funded the loan.
Union Mortgage points out that it is common practice to buy and sell commercial paper. Most of the commercial paper purchased by Union Mortgage was related to home improvement loans and it bought these papers at a discount. Union Mortgage argued that a discount or a "chop" is common in the banking industry. Union Mortgage claimed that it was a secondary lender, and, as such, was not required to inform the customer of the discount.
Union Mortgage contended that American Home was not its agent. Union Mortgage asserted that it bought only about 50% of American Home's commercial paper and was not contractually bound to buy any of its commercial paper. The evidence was also susceptible to the construction, however, that Union Mortgage approved 50-60% of the loan applications submitted by American Home, and there was no evidence that American Home submitted loan applications to any other financier or performed repairs for any of the applicants for whom Union Mortgage denied credit. Union Mortgage claimed that American Home and Barlow conspired to falsely indicate that the loan for the home repairs was substantially greater than the amount of money actually lent. Union Mortgage contended that it never made any misrepresentations to Barlow, but that Barlow misrepresented material facts to Union Mortgage prior to its purchase of her mortgage. Union Mortgage claimed that it relied on those fraudulent misrepresentations and was thereby damaged.
With that general statement of the parties, the claims, and the defenses in mind, we turn to a detailed statement of the facts. Because the jury returned a verdict for the plaintiffs, we are bound to assume that the jury drew all inferences favorable to the plaintiffs that the evidence will support.
The undisputed facts in this case are as follows: On August 2, 1988, Willie Mae Barlow and her son, Willie J. Galy, signed a contract with American Home for $8,000 in home repairs. The loan was secured by a mortgage on Barlow's house. The repairs to be done on Barlow's house were as follows: (1) install vinyl in the kitchen and hall; (2) paint, scrape, and trim the exterior of the house; (3) install two storm doors; and (4) repair plumbing in the bathroom. The annual percentage rate on the loan was 17.98% which made the total amount of payments due on the loan $17,284.80 over its 10-year term. Barlow and her son then executed a mortgage on Barlow's house to American Home on August 2, 1988, which American Home immediately assigned to Union Mortgage in the same document. Union Mortgage paid American Home $7,075 for the mortgage. That is, Union Mortgage discounted the $8,000 loan by 10% and charged a $125 fee. Subsequently, Union Mortgage sold the mortgage to the Mitsui Bank of Japan for $7,975.93.[1]
Barlow testified at trial that she applied for a $2,000 loan with American Home in 1987 and was turned down. Barlow needed the money to pay her daughter's medical bills. In late July 1988, Ida Sellers of American Home contacted Barlow and told her that her loan application had been reviewed again and that she was eligible for a loan.
On August 2, 1988, Nell Stanberry, of American Home, contacted Barlow and told her that Union Mortgage could lend her money only if American Home could make some repairs on her house. Although Barlow *1339 did not need any repairs on her house, which was built in 1985, she agreed to let American Home make a few repairs in order to get the needed loan. At the time, Barlow was delinquent on her loan payments to the Farmers Home Administration, which had financed the building of her house and which held a first mortgage on the house. American Home paid the delinquent mortgage payment for Barlow in order for Barlow to qualify for the home repair loan. Barlow signed several incomplete documents, including an $8,000 loan contract and a mortgage to American Home containing an assignment to Union Mortgage. Barlow also signed a financial disclosure statement for Union Mortgage, which enabled Union Mortgage to find out Barlow's wages as a maid. Barlow and her son signed the documents on August 2, 1988, but did not have a chance to review them because Stanberry was "in a hurry to return to Birmingham." Stanberry told Barlow that she would complete the documents and mail them to her.
On August 3, 1988, Barlow decided that her house did not need $6,000 in repairs. However, on that date, repairmen from American Home arrived at Barlow's house; they told her that it was too late to rescind the contract. The repairs were made that date and shortly thereafter, Ida Sellers called Barlow and told her that she would be receiving a check for $2,000. Sellers stated that American Home was supposed to do only home repair and could not directly lend Barlow any money, and, therefore, that the $2,000 check had to be payable to a third party. Barlow told Sellers to make the check payable to a friend of Barlow's.
On August 11, 1988, American Home mailed the then-completed documents to Barlow. The documents signed by Barlow and Galy were a home improvement retail installment contract, a security agreement, a disclosure statement, a credit application, a mortgage, and a quitclaim deed. Barlow stated that she did not at that time realize that she had signed a quitclaim deed giving title to her house to herself and her son. The loan contract stated that the last day to rescind the contract was August 5, 1988. Barlow did not know about the right to cancel until it was too late, because American Home did not mail the contract until August 11, 1988.
On August 12, 1988, Barlow filled out a completion certificate for Union Mortgage, stating that all the repair work had been done. A representative of Union Mortgage telephoned Barlow to see if all the repairs had, in fact, been done. Barlow responded to all the questions by the Union Mortgage representative, answering them as Nell Stanberry had instructed her to do. Specifically, Barlow told the Union Mortgage representative that the home repair work had been completed to her satisfaction and that all the loan proceeds had been used for home repair. On cross-examination, Barlow admitted that she had said that the entire $8,000 loan was used for home repairs, as she had been instructed to do.
Barlow was unable to make the scheduled payments to Union Mortgage because of her limited income. According to Barlow, a representative of Union Mortgage telephoned and threatened to "kick her butt out in the street" if the payments were not made.
A former branch manager for Union Mortgage, Paul Cannon, testified, in a deposition that was read at trial, that Union Mortgage set quotas for the number of home improvement loans to be generated from each branch.
William D. Crosby, a former national bank examiner, testified that American Home could be the agent of Union Mortgage because American Home was totally dependent on Union Mortgage for financing the loans. Crosby stated that Union Mortgage could also be considered as the primary lender in regard to this loan. Crosby stated that there is a difference between a primary lender and a secondary lender. He testified that a primary lender makes the credit decision, notifies the borrower of rejections, establishes the discount on the loan at the time the loan is made, and charges an origination fee on loans, all of which Union Mortgage had done in this case. He also stated that he had never seen a case where a discount *1340 was set by a secondary lender prior to funding the loan, which is what Union Mortgage claims was its role. He also testified that a primary lender is required by the federal Truth-in-Lending Act to disclose the discount and the origination fee as part of the finance charge.
An expert in banking, Benton Gup, testifying for Union Mortgage, said that Union Mortgage was a secondary lender that purchased Barlow's loan. Gup stated on cross-examination that if Union Mortgage had been the primary lender then it would have been required to disclose to the borrower the amount of the discount and any origination fee.
Union Mortgage's executive vice-president, James Borschow, testified that, before purchasing a mortgage, Union Mortgage followed a verification process. The process included a completion certificate and a telephone conversation between Union Mortgage and the customer. According to Borschow, the purpose of this process is to ensure that the customer is satisfied with the repair work and to ensure that all the proceeds of the loan went for home repairs. Borschow testified that Union Mortgage bases its decision on whether to purchase the mortgage on this verification process. He stated that if Barlow had admitted that she expected to receive $2,000 cash from the loan, then Union Mortgage would not have purchased her mortgage.
In order to show that the defendants had engaged in an alleged pattern, practice, or scheme of generating inflated mortgages without regard for the effect of the transaction on the mortgagor, the plaintiffs introduced evidence of similar transactions in which American Home had generated mortgages for Union Mortgage.[2] In the spring of 1988, Lucinda and Elijah Rudolph entered into such a transaction. This transaction led to one of the first jobs performed by American Home with financing by Union Mortgage; American Home had received approval as a Union Mortgage dealer in March 1988. When Vicki Herd, a Union Mortgage employee, telephoned Lucinda Rudolph at 4:05 p.m. on Friday, May 6, 1988, Herd taped the conversation, with Rudolph's permission. The transcript of that tape includes the following:
"[Herd]: Okay, we show the amount that you paid for the improvement work to be $6,000.00. Is that correct, ma'am?
"[Rudolph]: $6,000.00!
"That's what I'm showing on the contract.... Is that not correct?
"I'm not sure. I thought the loan payment was about $4,700.
". . . .
"Okay, what I'm going to do, as soon as we hang up the phone, I'm going to contact American Home Improvement, or actually what I'll do, is that we have a branch that's located in your area that they work with, and they'll be in contact with American Home Improvement and let them know that you don't have a copy of your contract and from what you can recall, the amount was a lot less. But, you know, of course, you aren't sure, you know. But we'll seeyou know, but we'll get them to get a copy of your contract out there to you so we can verify this information. Okay? Now, we'll go ahead and wait to set up your due date then until we get this finalized, because there's, you know, there's really no sense, you know, setting up a due date, you know, if we're going
"When you get it straight, do you have an idea when I'll be receiving checks?
"When you'll be receiving a check?
"Un, huh.
"Okay, what check are you supposed to be receiving, ma'am?
"Iit was about the loan, I guessI thought.
"Okay, all right. When you talked with American Home Improvement did they promise to send your, or, you know, that we would or they would send you a *1341 check of some sort? Is that what you're thinking?
"I was thinking it was a loan besides the fixing of the house, and I thought there would be something in itelse, in it for me. That's what I thought. I thought I was making a loan.
"Okay, did they tell you how much that was going to be, because I'm not familiar with that. Our contract isn't broke out that way. Which, you know, doesn't mean that that's not the way they were going to do it, just that that's not the way my contract is broke out.
"I don't know what it was supposed to be. I was just waiting to hear from somebody.
"Okay, and you were under the impression that the moneysome of the money was used to do your home improvements and some of the money was supposed to come back to you. Is that correct?
"That's what I thought.
"Okay. Well, I'll let them know that too, because as far as my work information here, the loan documents that I have, it did not show that, you know, that there were monies, you know, to be given back to you.
"Oh, okay.
"Do you have your work order handy at all, or do you have
"No, I don't have anything.
"You don't have any paper work whatsoever?
"No.
"Okay, we'll get in touch with American Home Improvement and get you some paper work to go by and have them, you know, explain, you know, a little bit better to you, you know, what the situation is, because obviously, they really didn't, you know, they really didn't leave the information with you which they should have. Okay?
"Okay.
"Well, that's all I can do for right now, and we'll be back in touch with you again, and if you could keep the number that you just called, and as soon as you have that information in front of you, if you would give us a call, please. Collect again.
"Okay. The work that is done, it looks nice.
"Okay, good. Okay, well, just give us a call as soon as you get that paper work in front of you and we'll also try to get ahold of you."
Thus, in one of its first transactions with American Home, Union Mortgage had clear information that American Home had not left any documents with the mortgagor, that the improvements were not worth the amount of the loan, and that the mortgagor expected to receive cash proceeds from the loan. In spite of this information, Union Mortgage had its Birmingham office communicate with American Home, not directly with Mrs. Rudolph. On the Monday morning after the above-transcribed Friday afternoon conversation, Nell Stanberry, of American Home, met Mrs. Rudolph at Mrs. Rudolph's place of work. Mrs. Rudolph then telephoned Union Mortgage and gave the "correct" informationthat the repairs were worth the amount of the loan and that she expected no cash from the loan. These facts supports the plaintiffs' theory that Union Mortgage directly participated in the fraud, if only because it took no direct action of its own to effectively prevent what it now claims to have been a violation of its practices.
Furthermore, the inference that Union Mortgage was aware that American Home's repair prices were inflated and that it gave cash payments[3] is supported by the testimony of Susie Shuford. Mrs. Shuford and her husband borrowed money for repairs to their house and to buy a septic tank. She testified that Stanberry told her the repairs would be $1900 and that she would receive $6800. The mortgage amount was $8900. She said that Walter *1342 Sellers,[4] Ida Sellers,[5] and Nell Stanberry all told her she was dealing with Union Mortgage, that the money came from Union Mortgage, and that Walter Sellers brought her $1000 cash. In its underwriting process whereby it approved the loan, Union Mortgage discounted the loan 21%. Most important for the point here, Union Mortgage discovered during its inquiries regarding approval of the loan that there was a $2542.95 judgment lien against the Shufords' property. James Borschow, the executive vice president of Union Mortgage who was in charge of branch operations at the time of these mortgages, testified that in the case of the Shuford mortgage, Union Mortgage funded the loan and American Home paid the lien out of its portion of the proceeds. Borschow testified that American Home probably made very little profit out of the Shuford transaction, but the very fact that Union Mortgage assumed its dealer could absorb a $2500 charge out of an $8900 loan belies its contention that it reviewed the loan applications for excessive charges to the mortgagors.
At the conclusion of the trial, the jury found in favor of the plaintiffs on all three of their claims. As to the fraud claim, the jury awarded the plaintiffs $150,000 in compensatory damages and $6,000,000 in punitive damages. The jury awarded $1,000 in compensatory damages and $1,000 in punitive damages on the conspiracy claim. On the breach of contract claim, the jury awarded $1,000 in compensatory damages.
Union Mortgage filed a motion for a JNOV, a new trial, or a remittitur. The trial court denied the motion and entered an order pursuant to Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989), and Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986), holding that the verdict was not excessive.
Did the trial court err in failing to grant a new trial based on alleged juror misconduct?
Union Mortgage claims that the trial court abused its discretion in failing to grant a new trial based on seven jurors' alleged failure to accurately respond to questions on voir dire. Union Mortgage claims that seven of the jurors knew key witnesses for the plaintiffs. The affidavits of jurors Mary Edwards, Tammy Bandy, Bessie McMeans, Comer Taylor, Eugene Oliver, Lula Gordon, Rosebud Hall, and Eddie Reese were considered by the trial judge, along with the court reporter's transcript, in determining whether Union Mortgage may have been prejudiced by the jurors' conduct.
Parties involved in litigation are entitled to true and honest answers from prospective jurors in order to help them exercise their discretion in the use of peremptory strikes and, when jurors fail to answer questions correctly, the parties are denied the exercise of that right. Martin v. Mansell, 357 So.2d 964 (Ala.1978). The proper inquiry on a motion for a new trial based on improper or nonexistent responses to voir dire questions is whether the response, or the lack of response, resulted in probable prejudice to the movant. Freeman v. Hall, 286 Ala. 161, 238 So.2d 330 (1970). Not every failure of a prospective juror to respond correctly to a voir dire question will entitle the losing party to a new trial. Wallace v. Campbell, 475 So.2d 521 (Ala.1985).
The determination of whether the complaining party was prejudiced by a juror's failure to answer voir dire questions is a matter within the discretion of the trial court and will not be reversed unless the court has abused its discretion. Freeman, supra. Some of the factors that this Court has approved for using to determine whether there was probable prejudice include: "temporal remoteness of the matter inquired about, the ambiguity of the question propounded, the prospective juror's inadvertence or willfulness in falsifying or failing to answer, the failure of the juror to recollect, and the materiality of the matter *1343 inquired about." Freeman, 286 Ala. at 167, 238 So.2d at 336.
In the instant case, the record reflects that these seven jurors stated that they had no personal relationship with any of the witnesses. All of the seven jurors indicated that they merely "knew of" some of these witnesses. Indeed, there seems to be no relationship between the witnesses and the jurors other than a casual acquaintance. The record also shows that some of the jurors did in fact raise their hands when asked by Union Mortgage's counsel whether they knew certain witnesses. Clearly, there was no abuse of discretion by the trial court in denying the motion for a new trial based on alleged juror misconduct.
Did the trial court err in failing to grant a new trial based on inconsistent verdicts or the jury's failure to follow the court's instructions?
The trial court submitted to the jury the question of whether American Home and its agents were acting as agents of Union Mortgage in doing the allegedly wrongful acts that were the subject of the complaint and of the plaintiffs' evidence. After instructing the jury on the law of agency, the law of fraud, and other pertinent law, the court instructed the jury on how to return its verdict. It gave the following instruction on count one:
"[I]n count one, [which] is the fraud claim, if you are reasonably satisfied that American Home and the Sellerses were acting as agents of Union Mortgage and that they were committing a fraud and that Mrs. Barlow was damaged as a proximate result of that fraud, then she would be entitled to a verdict at your hands on the fraud count."
The court's charge on the law of conspiracy had included the following:
"Now, it is also the law that a corporation cannot be guilty of conspiring with its agents who are acting within the line and scope of their employment. It's just impossible the law says for the master to conspire with its agent because they are one [and] the same."
On count two, the court charged the jury:
"[I]f you find that American Home and the Sellerses were the agents of Union Mortgage then you'd not be able to find for Mrs. Barlow on the [sic] count two. But if you find that they are not the agents of Union Mortgage and you are reasonably satisfied from the evidence of the conspiracy then your verdict would [be in favor of the plaintiffs on count two]."
The court also instructed the jury how to return a verdict on the contract count. After these instructions, the court said: "Now, let me remind you that we must have a verdict whether it's for the Plaintiff or for the Defendant on each one of those three claims." It also instructed the jury to return a verdict on the fraud and conspiracy counts of the counterclaim.
After the jury had deliberated for about 45 minutes, it returned to the jury box, and the following then transpired:
"The Court: Go ahead and sit down.
"All right. Ladies and gentlemen, have you reached a verdict?
"The Foreperson: Yes, we have.
"The Court: May I have it please? Thank you. You may be seated.
"Now, ladies and gentlemen, I thought I had made it clear that we have to have a verdict on each one of these claims. You have furnished me with a verdict on one of the claims but there areon two of the claims, but there are two others that you need to furnish me with a verdict on. And if you will, if you will return to the jury room and furnish me with a verdict on the conspiracy count and the breach of contract count. You need to go back into the jury room to do that."
After further deliberations, the jury returned verdicts for the plaintiffs on counts two and three of the complaint. It is apparent from the judge's remarks that the initial verdict was for the plaintiffs on the fraud claim and on both counts of the counterclaim. The jury awarded damages on the three counts of the complaint as follows: *1344 on the fraud count, $150,000 compensatory damages and $6,000,000 punitive damages; on the conspiracy count, $1,000 compensatory damages and $1,000 punitive damages; on the contract count, $1,000 compensatory damages.
As a ground for its motion for new trial, Union Mortgage argued that the verdict for the plaintiffs on the fraud count was inconsistent with the verdict for the plaintiffs on the conspiracy count and that, in returning these two verdicts, the jury had failed to follow the trial court's instructions. The plaintiffs respond to the same issue on appeal, in part, by arguing that Union Mortgage's objection came too late.
This Court has held that an inconsistent-verdict issue can be raised for the first time on a motion for new trial if the objection is to the substance or the inconsistency of the verdict, not to the forms submitted to the jury for its verdict. See Barnes v. Oswalt, 579 So.2d 1319 (Ala.1991) (per Hornsby, C.J., with three Justices concurring and one Justice concurring in the result); A.L. Williams & Assocs., Inc. v. Williams, 517 So.2d 596 (Ala.1987); Stinson v. Acme Propane Gas Co., 391 So.2d 659 (Ala.1980); Lewis v. Moss, 347 So.2d 91 (Ala.1977).
Any infirmity in the verdict in this case, however, was caused by the trial court's instructions that the jury should return to the jury room for further deliberation on the conspiracy count. Under the instructions given to it before it began deliberations, the jury's initial verdict for the plaintiffs on the fraud count necessarily precluded a verdict for the plaintiffs on the conspiracy count. When the jury returned its verdict for the plaintiffs on the fraud count, therefore, the court should have accepted that as a verdict for the defendants on the conspiracy count and sent the jury back for further deliberations only on the contract count. Alternatively, in sending the jury back for a signed verdict on the conspiracy count, the trial court should have reminded the jury of its instructions that it could not return a verdict for the plaintiffs on both the fraud count and the conspiracy count.
This error is easily cured by striking the verdict on the conspiracy count. Although judgments on inconsistent verdicts are ordinarily reversed without speculation as to what the jury intended, see A.L. Williams & Assocs. and the other cases cited supra, this Court has also, when appropriate, affirmed a judgment based on inconsistent verdicts conditioned upon a remittitur. In Farmers & Merchants Bank of Centre v. Hancock, 506 So.2d 305 (Ala. 1987),[6] the bank sued its borrower and the borrower's guarantor for a deficiency judgment regarding the sale of collateral securing a note, and the defendants counterclaimed, alleging a wrongful repossession and a commercially unreasonable sale. The jury found for the defendants on both the complaint and the counterclaim, awarding actual damages of $98,000, punitive damages of $30,000, and mental anguish damages of $20,000. This Court held that an award of damages on the claim of a commercially unreasonable sale was precluded by the finding, inherent in the defendants' verdict on the complaint, that there had been an accord and satisfaction. The Court held that the actual damages could not be apportioned between the two counts of the counterclaim, but that the punitive and mental anguish damages were attributable only to the wrongful repossession claim. Therefore, the Court held, the judgment could be affirmed if the counterclaimants accepted a remittitur of the entire $98,000 in actual damages.
In Barnes v. Dale, 530 So.2d 770, 778 (Ala.1988), this Court said:
"The authority of an appellate court to direct a judgment contrary to the jury's verdict is grounded in statutory and common law. Code 1975, § 12-22-70, which is a mere codification of the court's inherent power, states that the appellate court may, `upon the reversal of any judgment or decree remand the same for further proceedings or enter such judgment or decree as the court below should have entered or rendered, when the *1345 record enables it to do so.' This authority is historically supported. See Henry v. White, 222 Ala. 228, 131 So. 899 (1931); First Nat. Bank of Stevenson v. Crawford, 25 Ala.App. 463, 149 So. 230, cert. den., 227 Ala. 188, 149 So. 228 (1933); Campbell v. Tucker, 26 Ala.App. 100, 154 So. 821, cert. den., 228 Ala. 658, 154 So. 825 (1934); Wilkes v. Stacy Williams Co, 235 Ala. 343, 179 So. 245 (1938); Drummond v. Franck, 252 Ala. 474, 41 So.2d 268 (1949); and Haden v. Lee's Mobile Homes, Inc., 41 Ala.App. 376, 136 So.2d 912 [(1961), cert. den., 273 Ala. 708, 136 So.2d 920 (1962) ] (1962)."
Similarly, Ala.Code 1975, § 12-22-71, codifies the power of an appellate court to affirm a judgment conditioned on the plaintiffs' acceptance of a remittitur where the only ground for reversal is that the judgment of the lower court is excessive.
In this case there is no need for speculation: the jury, by its first verdict, clearly indicated a finding that American Home and its agents were acting as agents of Union Mortgage. That verdict was consistent with the later verdict for the plaintiffs on the contract count. Any confusion was engendered only by the court's sending the jury for further deliberations on the conspiracy count without reminding it of the earlier instructions that it could not return a verdict for the plaintiffs on both fraud and conspiracy. Indeed, the judge himself seems not to have had those earlier instructions in mind either when he sent the jury back on the conspiracy count or when he accepted its verdict on that count. That being the case, we cannot fault the jury for forgetting those instructions or penalize the plaintiff by reversing the judgment on this ground.
For these reasons, we hold that any error presented by this issue can be cured by a remittitur of the $2,000 award on the conspiracy count. There was evidence to sustain a finding for the plaintiffs on either the fraud count, or the conspiracy count, or both, depending upon how the jury viewed the evidence. Nevertheless, in view of the judge's charge, we will remit the amount awarded on the conspiracy count. Therefore, as to this issue, we hold that it presents no basis for reversal, provided the plaintiffs accept a remittitur of $2,000 of the judgment.
Was the jury's award of punitive damages excessive under the facts of this case?
The jury awarded the plaintiffs $6,001,000 in punitive damages. Although there is a statutory cap of $250,000 on punitive damages awards based on fraud, there are exceptions. § 6-11-21, Ala.Code 1975. One exception is when the defendant has engaged in "a pattern and practice of intentional wrongful conduct, even though the damage or injury was inflicted only upon the plaintiff." § 6-11-21(1). There was ample evidence presented to support the trial court's determination that Union Mortgage engaged in a pattern and practice of intentional wrongful conduct.
We must now decide if the punitive damages award was excessive. The following is the order entered by the trial court after an extensive hearing pursuant to Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986) and its progeny:
"This cause coming on to be heard before this Court on April 8, 1991, on plaintiffs' Motion for Punitive Damages Hearing based upon the award of punitive damages by the jury in this case on March 1, 1991.
"On March 1, 1991, the jury returned a verdict in this case in favor of the plaintiffs and against the defendant, Union Mortgage Company, Inc., a corporation (hereinafter Union Mortgage). Under Count One of plaintiffs' complaint for fraud, the verdict was rendered for compensatory damages in the amount of $150,000.00 and punitive damages in the amount of $6,000,000.00; under Count Two of plaintiffs' complaint for civil conspiracy the verdict was rendered, for compensatory damages in the amount of $1,000.00 and punitive damages in the amount of $1,000.00; and under Count Three of plaintiffs' complaint for breach of contract the verdict was rendered for compensatory damages in the amount of $1,000.00. On March 4, 1991, this Court *1346 entered a judgment on the verdict in the total amount of $6,153,000.00
"Pursuant to the request of the plaintiffs a hearing was conducted by this Court on April 8, 1991, in accordance with the provisions of Section 6-11-23(b), Code of Alabama, 1975, as amended, and pursuant to the recent decisions rendered by the Alabama Supreme Court in Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986); Green Oil Company v. Hornsby, 539 So.2d 218 (Ala.1989); and Armstrong v. Roger's Outdoor Sports, Inc., 581 So.2d 414 (Ala.1991).
"During this hearing the Court heard relevant evidence submitted by both the plaintiffs and the defendant regarding the economic impact of the verdict on the defendant, the amount of compensatory damages awarded, the amount of punitive damages awarded, other similar acts of the defendant, efforts of the defendant to make remedial changes to prevent the occurrence of similar acts in the future, the opportunity of the defendant to remedy any wrong as to the plaintiffs, the complicity of the plaintiffs, as well as other relevant evidence.
"This Court has taken into account that punitive damages should bear a reasonable relationship to potential harm from the defendant's actions as well as to the actual harm caused by the defendant.
"This Court has also considered what degree of reprehensibility should attach to the conduct of the defendant in this case. The factors used by the Court in determining the degree of reprehensibility include the wrongfulness of the conduct, the duration of the conduct, the degree of the defendant's awareness of any actual or potential harm occurring or likely to occur as a result of its conduct, and any attempted concealment of the harm, along with similar past conduct, if any, and it[s] frequency.
"In rendering its findings, this Court considered the evidence admitted in the trial of this case and the evidence submitted by the parties at the hearing conducted on April 8, 1991.
"There is ample evidence to support the verdict for the plaintiffs for compensatory damages under the fraud Count of $150,000.00 due to intentional fraud concerning the plaintiffs' home. Furthermore, there is clear and convincing evidence to support a finding by the jury that the defendant consciously or deliberately engaged in fraud with regard to the plaintiffs. The issue to be determined is whether the punitive damages award of $6,001,000.00 is appropriate and justified by the evidence.
"Having considered the evidence presented at the trial of this case and at the hearing conducted by this Court on April 8, 1991, this Court finds that the award of punitive damages in the total amount of $6,001,000.00 is not excessive and is appropriate for the reasons that follow.
"The evidence supports the finding that the magnitude and scope of the fraudulent scheme conducted by the defendant is substantial. The defendant engaged in a pattern and practice of intentional fraud affecting citizens throughout the State of Alabama and indeed the continental United States. The object of the defendant's fraudulent scheme is the enrichment of the defendant and its shareholder by means of preying upon the poor and unsophisticated. This object is accomplished by obtaining a mortgage on the victim's home for a consideration substantially less than stated in the mortgage and disclosure statement. This Court finds that the manner in which the defendant conducts its business presents a continuing risk of harm to the public and serves no legitimate business purpose.
"This Court finds that the award of the jury is not excessive considering the economic impact on the defendant. The most recent financial statements for December 31, 1990, of the defendant Union Mortgage has interest income derived from its mortgage portfolio of approximately $30,863,000.00 for 1990. The sole shareholder of the defendant Union Mortgage is Skopbank located in Helsinki, Finland. Skopbank controls Union *1347 Mortgage. Until his death in February, 1991, Union Mortgage's Chief Executive Officer was a Finnish citizen and Skopbank officer sent by Skopbank to manage Union Mortgage. Skopbank continued to pay a portion of Union Mortgage's Chief Executive Officer's salary. The evidence shows that Skopbank continues to control the affairs of its U.S. subsidiaries, including Union Mortgage.
"The Court has considered the economic relationship between Skopbank and its wholly-owned subsidiary Union Mortgage. Skopbank has extended to Union Mortgage an unsecured line of credit totalling $550,000,000.00 through a wholly-owned United States holding company. Union Mortgage did not produce any documents which reflect any obligation to repay the money advanced under the `line of credit.' Based upon the evidence presented at the hearing on April 8, 1991, this Court finds that a substantial portion of the $550,000,000.00 represents a contribution of capital by Skopbank of Helsinki, Finland, to its wholly-owned subsidiary Union Mortgage. The most recent available consolidated financial statement presented for Skopbank of Helsinki, Finland, for December 31, 1989, reflects that Skopbank realized income from the operation of Union Mortgage of approximately $12,600,000.00 (U.S. dollars).
"The jury was justified in awarding sufficient damages to prevent similar wrongs in the future especially in light of the fact that the verdict in this case would have little impact on the defendant unless it is substantial. The Court's understanding of the purpose of awarding punitive damages is to punish the wrongdoer and deter others from similar wrongful conduct in the future. The verdict in this case should be large enough to deter this type of conduct. The verdict will punish the defendant but at the same time the verdict is not so large as to unduly burden the defendant based upon the evidence before this Court. Therefore, the Court finds that the punitive award in the total amount of $6,001,000.00 is not excessive.
"The jury awarded compensatory damages in the total amount of $152,000.00. This award is supported in part by the evidence at trial of this case that plaintiff Willie Mae Barlow was made to suffer mental anguish due to the oppressive conduct of the defendant. This Court finds that the punitive award is consistent with the amount of the compensatory damages awarded by the jury.
"The evidence supports a finding that defendant has engaged in the same conduct constituting fraud from Union Mortgage's inception in 1982 until the present. Evidence in the hearing of April 8, 1991, established that as recently as April 1, 1991, the defendant has made no effort to change the manner in which it conducts business. Furthermore, the defendant's president admitted at the hearing of April 8, 1991, that the defendant's business is being conducted in the same manner.
"The evidence supports a finding that the defendant had ample opportunity to remedy the wrong committed by it against the plaintiffs and others similarly situated, but the defendant failed to do so. Testimony before the Court during the hearing of April 8, 1991, established that the manner in which the defendant conducts its business will always result in harm to the customer due to the fact that there is no disclosure of the `chop'. The wrong committed by the defendant cannot be remedied as long as the defendant continues to do business in the manner in which it is being done even until April 8, 1991.
"Accordingly, based upon the findings set forth herein, this Court finds that the punitive damages award is not excessive, and the punitive damages award of the jury in the amount of $6,001,000.00 is sustained.
"DONE and ORDERED this 26th day of April, 1991.
 "/s/ Arthur E. Gamble
 "CIRCUIT JUDGE"
In reviewing the punitive damages award in this case, the trial judge stated the reasons why the verdict should not be remitted. *1348 After a thorough review of the record, we hold that the facts aptly support the trial court's decision. We think it is interesting to note that in its counterclaim, Union Mortgage sued the plaintiffs for over $6,000,000 in punitive damages. Quite possibly, the jury viewed this amount as an appropriate measurement of the amount necessary to punish and deter Union Mortgage.
We note that no constitutional issues were raised at trial or on motion for new trial.[7] Therefore, we do not address any constitutional issues regarding the imposition of punitive damages in this case.
We find Union Mortgage's argument that there was insufficient evidence to support the verdict to be without merit.
Based on the foregoing, the judgment of the trial court is due to be affirmed on the condition that the plaintiffs accept a remittitur of the $2,000 of the judgment that is attributable to the verdict on the conspiracy claim within 28 days of the date of this opinion, January 10, 1992, which will result in a judgment for the plaintiffs in the amount of $6,151,000.
AFFIRMED CONDITIONALLY.
HORNSBY, C.J., and MADDOX, ALMON, SHORES, ADAMS, KENNEDY and INGRAM, JJ., concur.
HOUSTON and STEAGALL, JJ., concur specially.
HOUSTON, Justice (concurring specially).
I will vote to permit the plaintiffs to be compensated, even though their wrong contributed to their loss. However, I refuse to allow the plaintiffs to be rewarded for their misdeeds. Consequently, I will not vote to award them any punitive damages, because this would be a reward for those misdeeds. However, this does not mean that the defendant should not be required to pay the amount of punitive damages assessed against it.
The trial court found that the punitive damages assessed against the defendant did not violate its right to due process or other constitutional rights. With the record before us, I cannot hold that the trial court erred. Therefore, I would affirm the amount of the punitive damages award; however, after the deduction of expenses and attorney fees, I would direct that the balance of the punitive damages award be paid to the General Fund of the State of Alabama to be used for the public good.
STEAGALL, J., concurs.
NOTES
[1] Union Mortgage repurchased the mortgage from Mitsui Bank after Barlow defaulted on the payments. American Home then repurchased the mortgage from Union Mortgage.
[2] Union Mortgage characterized the transaction in this case as a purchase by it in the secondary mortgage market of a loan and mortgage created by American Home as the primary lender. As we have shown, the evidence would sustain a finding that Union Mortgage was the primary lender.
[3] Union Mortgage persisted at trial and on appeal in referring to the cash payments as "kickbacks."
[4] A Lowndes County resident who had referred Barlow and several of her witnesses to American Home for cash loans.
[5] An employee of American Home.
[6] Opinion extended, 510 So.2d 201 (Ala.1987).
[7] The appellant's counsel on appeal were not its trial counsel.