MURDOCK, Justice.
Larry Dunaway[1] filed a Rule 32, Ala. R.Crim. P., petition in the Barbour Circuit Court (“the Rule 32 court”) challenging his 1997 convictions for the capital murder of his girlfriend Tressa M. Patterson and Patterson’s 22-month-old son James Patterson.[2] See Dunaway v. State, 746 So.2d 1021 (Ala.Crim.App.1998) (affirming Duna-way’s convictions) (“Dunaway /”), affd, 746 So.2d 1042 (Ala.1999), cert. denied, 529 U.S. 1089, 120 S.Ct. 1724, 146 L.Ed.2d 645 (2000). The Rule 32 court entered an order denying Dunaway’s petition, and the Court of Criminal Appeals affirmed. See Dunaway v. State, 198 So.3d 530 (Ala.Crim.App.2009) (“Dunaway II”). Duna-way petitioned this Court for a writ of certiorari to review the Court of Criminal Appeals’ decision in Dunaway II. We granted the writ to consider (1) Dunaway’s claims of misconduct by four jurors who allegedly failed to disclose pertinent information during voir dire; (2) Dunaway’s claim that the Rule 32 court erred by denying his Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), claims that he was denied due process as a result of District Attorney Boyd Whig- *569 ham’s failure to disclose alleged relationships between him and certain jurors; and (3) Dunaway’s claim that he received ineffective assistance of trial counsel during the sentencing phase of his trial. Because we conclude that Dunaway is entitled to a new trial based on his juror-misconduct claim, we pretermit any discussion of his nondisclosure claim as to Whigham and his ineffective-assistance-of-counsel claim.
I. Background Facts and Procedural History
The .following is from the rendition of facts by the Court of Criminal Appeals in Dunaway I:
“The evidence showed that [Dunaway] lived with his girlfriend, Tressa Patterson, and her son, James Patterson, in a mobile home in Barbour County. On the evening of January 8, 1997, the mobile home burned. Investigators subsequently discovered the burned bodies of Tressa Patterson and James Patterson, who was 22 months old, in the remains of the mobile home.
“Deputy State Fire Marshal Edward Paulk investigated the fire. Paulk testified that the fire started in the living room area and that it consumed the center of the room. He determined that the fire was not caused by accidental or natural causes. He also testified that alcohol could have been used as an accel-erant, but that evidence it had- been so used would have been destroyed by the water used to extinguish the fire.
“In the course of his investigation, Paulk interviewed [Dunaway], [Duna-way] made an oral statement and gave a written statement about the fire. In his oral statement, [Dunaway] claimed-that he was not present when the fire began. He stated that he had ridden with a ‘crack-head’ in a red pickup truck into Clayton, where he hoped to sell some crack cocaine. [Dunaway] claimed that he decided not to sell the crack, that the man dropped him off on Highway 239 near his mobile home, and that he walked home from there. [Dunaway] claimed that he first saw the fire while he was walking home. He stated that the last time he saw Tressa, she was lying on the couch and James was with her.
“Subsequently, [Dunaway] admitted to Paulk that the story about the man in the red truck was not true. Paiilk then asked [Dunaway] if he could take á written statement from him-, and [Dunaway] agreed. In that statement, [Dunaway] admitted that he and Tressa had been having problems in their relationship since Thanksgiving of 1996. He stated that Tressa had told him to'move out by December 26, 1996, that he had not moved out, and that they had been arguing' since December 26, 1996. On or about January 6, 1997, when [Dunaway] still had not moved out, Tressa removed his clothing from the mobile home.
“On January 8, 1997, [Dunaway] watched over James while Tressa was at work. He stated that he and Tressa got into another argumént when she came home from work, and that'he put a rifle to his head to show his ‘love’ for her. He claimed that he pulled the trigger, but it did not fire. He then laid the rifle on his lap and accidentally fired it" at Tressa. ' [Dunaway] stated that Tressa gasped when she was struck by the first bullet. The noise' caused him to panic and he accidentally fired the rifle a second time. [Dunaway] told Paulk that after he determined that Tressa was dead, he said to James, ‘Man, yo momma’s dead.’ He then poured rubbing alcohol over Tressa’s body and beside the fireplace in the living room. He-laid James down near his mother’s body and *570 set the alcohol on fire. He then fled to a nearby wooded area and hid the rifle.
“[Dunaway] testified at trial in his own defense. He testified that his mother suffered from paranoid schizophrenia, and that he had heard voices telling him what to do since he was a child. His trial testimony about the murders was similar to his statement to Paulk, except that he testified that voices started talking to him while he was in the mobile home. He stated that he did not remember everything he did between the time he shot Tressa and the time he realized he, was in the. woods, and he added that he was not in control of, himself at the time. He contended that he did what the voices told him to do. He testified that he made up the story about going to Clayton because he was scared and nervous. He also, admitted that, in spite of his statements [to neighbors to the contrary] immediately following the fire,, he knew Tressa and James were in the mobile home when it was burning.
“During his testimony, [Dunaway] admitted that he had previously been convicted, pursuant to a guilty plea, of carjacking in Louisiana. He also admitted that a weapon had been used to commit the crime.
“Dr. James Lauridson, the medical examiner, .testified that Tressa died, from a .gunshot wound to the chest. He determined that she was badly injured before [Dunaway], started the fire, but she probably did not die instantly. There was no carbon, monoxide in her blood and no sign of inhaled smoke or soot in her airways. Therefore, Lauridson con- . eluded that she may not have been breathing when the fire began.
“Lauridson testified that James’s body showed no signs that he had suffered any injuries before the fire. There was a great deal of soot in his windpipe, indicating that he was probably alive when the fire became fully developed. Toxicological tests revealed that James had a fatal level of carbon monoxide in his blood. .Lauridson stated that James died because he choked to death while inhaling smoke and other by-products of the fire.
“[Dunaway] initially entered a plea of not guilty. Subsequently, he amended his plea to assert that he was not guilty by reason of mental disease nr defect. The trial court ordered an evaluation to determine whether [Dunaway] was suffering from a mental disease or .defect at the time of the offense; whether the symptoms of any disease or defect contributed to the commission of the offense, and, if so, in what manner; whether [Dunaway] was capable of assisting in his own defense; and whether he was competent to stand trial. Dr. Michael D’Errico, a forensic psychologist and certified forensic examiner for the State of Alabama, examined [Duna-way] pursuant to the trial court’s order and found [Dunaway] to be competent to stand trial.
“D’Errico met with [Dunaway] for one to two hours on June 5, 1997, interview- ■ ing him and administering a psychological test. D’Errico also reviewed reports by law enforcement officers, Paulk’s report, statements of several witnesses, and a statement [Dunaway] made to deputies about the offenses. Finally, D’Errico reviewed records pertaining to prior psychological treatment provided to [Dunaway], including treatment he received during. 1992 and 1993 at the Methodist Children’s Home of Ruston, Louisiana, and he conducted a telephone interview with [Dunaway’s] stepmother, who ‘had been partially responsible for *571 [his] upbringing since he was age five.’ Based on his evaluation ;of [Dunaway], D’Errico testified as follows:
“ ‘At the time I did my evaluation, I thought there was a possibility that Mr. Dunaway was experiencing symptoms of anxiety and possibly depression. But, overall, I didn’t have enough information to make a clear diagnosis of a- severe mental1 illness.
. i At the time I did my evaluation, I felt that Mr. Dunaway did not meet the usual criteria for what we call severe mental disease or defect.’
. “Dr. Fernando Lopez, a psychiatrist, evaluated [Dunaway] for the defense. He first talked to [Dunaway] on September 5, 1997, and subsequently talked to him on three other occasions. His evaluation included interviewing, psychological testing, and reviewing records relating to prior treatment. López testified, in part, as follows: . .
,‘“Q.r Based on your evaluations, can you give us and the jury some idea of how [Dunaway] reacted to certain questions or stimuli or whatever?
-“‘A. We interviewed the young man and tested him, and we reviewed some previous information we had from Louisiana, mostly, and interactions with other psychiatrists and counselors, and also reviewed forensic examinations by my colleagues, and my observations indicated that , this man is suffering from mental illness.
“‘Q. Okay. And at the current time you feel he is suffering from mental illness?
“ ‘A. This has been going on gradually for the past several years, and is coming to develop one of these days into an illness
“•‘The illness I’m talking about is schizophrenia. This is an illness of youngs adults, mostly -males, between 15 and 25 years of age. And half the women but later, 25 to 35 years of age. And it is incipient, it is gradual. It doesn’t happen overnight. It evolves gradually. And finally, these people come to the courts usually for behavior they have done, and they are displayed acting these thoughts that they have, misperception — misconceptions, and usually work with' sending them to state hospitals with psychiatric units to be treated;’
“He stated that, in his opinion, [Duna-way] was ‘undergoing this psychiatric disorder’ at the time of the murders. He further testified, T believe that he is suffering from a mental illness and, as such, his behavior, although he knows the difference between right and wrong, at the time of the incident, he could not perceive the wrongfulness of his acts.’ On cross-examination, he stated that [Dunaway] knew right from wrong but was not himself while he was committing the murders, He noted:
“ ‘[H]e can formulate things, but the will, the action, the volition we call it, is impaired in doing the thinking. At that moment, you can claim that he was under the influence of the irresistible impulse and he had to justify it cognitively, you know.’
“He stated that [Dunaway] perceived Tressa’s threatening to end their relationship as an attack or threat to him, and that his'mental condition caused him to react as he did. Therefore, Lopez concluded that [Dunaway] was reacting to feeling threatened and had no control over his reaction.
“Lopez also testified that [Dunaway] stated that he accidentally shot Tressa Patterson and then went into the woods. He told Lopez, that he started hearing voices telling him to ‘Send them to hell,’ and that he went back and set the mo *572 bile home on fire.... Lopez stated that [Dunaway] told him that he did not hear voices until after he shot Tressa Patterson and concealed the rifle. Lopez testified that his review of records of [Duna-way’s] psychological treatment in 1992 and 1993 indicated that [Dunaway] claimed that he heard voices at that time too. Lopez admitted, however, that [Dunaway] was experiencing some legal problems at that time and that he seemed to hear these ‘voices’ only when he was in legal trouble.”
Dunaway I, 746 So.2d at 1023-27 (citations to record omitted).
We note that Dunaway was 20 years old at the time of the murders. He had lived in Louisiana and Texas for most of his life and had moved to Alabama with Patterson and her child approximately three months before the murders.
As noted above, Dunaway filed a Rule 32 petition, which was denied after proceedings at which the court heard ore tenus evidence. We will discuss the pertinent testimony and evidence from the Rule 32 proceeding in conjunction with Dunaway’s respective claims.
II. Analysis
Before beginning our discussion of Dun-away’s claims, we note that the parties repeatedly reference the record from Dun-away I in their briefs and that Dunaway referenced that record in his Rule 32. petition. The Rule 32 court took judicial notice of the record from Dunaway I, as did the Court of Criminal Appeals. Dunaway II, 198 So.3d at 540 n. 3. We have also taken judicial notice of the record from Dunaway I, which was before us on Duna-way’s appeal from that decision.
Dunaway asserts that juror misconduct occurred as to jurors L.L., E.B., M.B., and V.S. A claim of juror misconduct raised in a postconviction petition concerns the issue whether there has been a “constitutional violation that would require a new trial” under Rule 32.1(a), Ala. R.Crim. P. Ex parte Pierce, 851 So.2d 606, 612 (Ala.2000).

A. Claim as to L.L,

Dunaway asserts that juror L.L. failed to disclose during voir dire that a member of her family had been the victim of an attempted murder approximately nine months before Dunaway’s trial.
On the day of voir dire, a few minutes before 10:45 a.m., the trial court gave prospective jurors a “Juror Information Questionnaire.” The questionnaire was a five-page form that asked for information such as a juror’s name, address, place of birth, marital status, children, parents, religious affiliation, military service, employment history, education, past jury service, past involvement in lawsuits, favored media resources, etc. When the trial judge delivered the questionnaires to the prospective jurors, he stated:
“I would ask you to complete it fully. Answer every question, fill in every blank that is called.for. If you have trouble reading, there will be somebody here who can assist you with that.... We are looking for information that would help speed things up a good bit. And it is very important that you fill these out accurately and completely.”
Among the questions on the questionnaire was the following: “21. Have you, or any member of your family or anyone you know ever been the victim of a crime?” L.L. answered “no” to that question.
Oral voir dire began- shortly after the prospective jurors returned from lunch at 12:45 p.m. As Dunaway notes in his brief: “[D]uring questioning of the venire, defense counsel specifically asked whether ‘anybody in your family [has] ever been a victim of a crime?’ Juror L.L. did not *573 respond.” (References to record omitted.) In addition, immediately after the aforementioned . question, defense . counsel asked:
“Now other than a family member, have any of you had a close or a good friend, however you would like to term it who has been a victim of a crime? In other words, a friend of yours that has been robbed.or murdered or raped or whatever the case?”
L.L. did not respond.
Despite the foregoing, at the Rule 32 proceeding, L.L. testified as follows:
“Q. Do you remember serving on a jury in 1997?
“A. Yes.
“Q. Was Larry Dunaway the defendant in that case?
“A. Yes.
“Q. [L.L.], has anyone in your family ever been the victim of a crime?
“A. Yes.
“Q. Who was that family member?
“A. [S.S.] •
“Q. What happened to..[S.S.]?
“A. She got shot.
“Q. Do you know where she got shot? “A. In her home in Clio;
“Q. Was she hospitalized as a result of her injuries?
“A. Yes.
“Q. And how long was she in the hospital?
“A. A little over a month if I’m not mistaken.
“Q. Were her injuries serious?
“A. Yes.
“Q. Were they life threatening?
“A. Yes.
“Q. Do you know when this happened?
“A.. I can’t be specific; ’95 or ’96. I’m not for sure.
“Q. Do you remember how you first found out that [S.S.] had been shot?
“A. Somebody had called.
“Q. Do you know if she knew the person that shot her?
“A. Yes.
“Q. And do you know how she knew him?
“A. I’m not for sure how she knew him.
“Q. Do you know if the person who shot her was arrested and went to the trial?
“A. It was like during the same time as this one, as [Dunaway’s] was. I am not sure what the results was.
“Q. Were you asked to be a juror in that ease?
“A. I was dismissed because I was related to [S.S.].
“Q. Are you close to age with [S.S.]?
“A. Two years difference.
“Q. Did you grow up close by?
“A. Like walking distance.
“Q. Were you close to her?
“A. Yes.
“Q. You grew up with her?
“A. Yes.”
On cross-examination, L.L. testified as follows:
“Q. ... I talked to you a week or so ago on the phone. I just need to ask you a few questions.
“Q. [Y]ou told me' back when I was talking to you on the telephone that if you were asked the question had a family member been shot or a victim of crime that you would have told the lawyers that if you were asked?
“A. Yes.
“Q. And I think you said if you didn’t tell them it was because—
“A. I didn’t understand it.
*574 “Q. I don’t want to put words in your mouth.
“A. Uh-huh (affirmative response).
“Q. I think there was a questionnaire that they asked y’all to fill out before [Dunaway’s] trial. Do you remember filling that out?
“A. I may have. It’s been a while. I . can’t remember what it was.
“Q. You don’t have any specific memory of filling out about five or six pages?
■ “A. ■ ‘ I remember filling something out, but I done forgot what it was because ' it’s been a while.
“Q. Well, if they asked you the question on the questionnaire if you or a member of your family had been the victim of a crime and you said, no, would that have been a mistake?
“A. Yes.
“Q. Now, the fact that your cousin was a victim of.a crime, .did that affect your deliberations in [Dunaway’s], case in any way whatsoever?
“A. No.
“Q. Did you base your verdict and your sentence recommendation just on the evidence that you heard while in the jury box and on Judge Gaither’s law?
“A. Yes.”
The Rule 32 court then engaged in a colloquy with L.L.:
“Q. [L.L.], let me ask you this: Are you sure .or do you know if the shooting of [S.S.] happened before on or after your service as a juror in the Dunaway case?
“A. It was before., , , .
“Q. Are you sure?
“A. Yes.; ■
“THE COURT: I tried the [S.S.] case after I took the Bench, but Duna-way was the year before. Do y’all have any dates or records that show?
“A. It was like during that same time because they had both of them' here during that time.
“[STATE’S COUNSEL]: In 'the Dunaway record, there was some references to the other defendant Gis-sendanner. And I think they struck the jury- and tried [Dunaway] first, and then they were going to try that case second. I don’t know if it was a mistrial or what.
“[DUNAWAY’S COUNSEL]: I think the defendant didn’t appear.
“THE COURT: That’s right.
“[STATE’S COUNSEL]: I think the record from Mr. Dunaway’s trial indicates specifically that that particular trial and jury was struck.
“I’m just trying to keep this file from turning into eighteen volumes.
“THE COURT: Just so the record is straight, [L.L.] was dismissed from the Gissendanner consideration because of being related to [S.S.] but not dismissed from the Dunaway case where she ended up' serving as a juror. .
“[STATE’S COUNSEL]: Correct.
“[DUNAWAY’S COUNSEL]: And it is our legal claim that the only reason she wasn’t dismissed was because of the failure to reveal the relationship when asked directly about it,
“THE COURT: You are claiming you didn’t know about it, but she was on the same panel and was dismissed from Gissendanner?
“[DUNAWAY’S COUNSEL]: The striking of the Dunaway jury happened separately but on the same day.
“THE COURT: Oh, they weren’t here? See, I wasn’t here then so I don’t know.
*575 “[STATE’S COUNSEL]: I know in the transcript there was some talk between Judge Gaither and the other defendant’s lawyer.
“THE COURT: There is no reference to consolidating of voir dires or qualifying the panel as a whole?
“[DUNAWAY’S COUNSEL]: No.
“[STATE’S COUNSEL]: I think general qualifications — I don’t know if they made the transcript, but there, was general voir dire in the Dunaway case, and then there were some questions from [the district attorney who prosecuted Dunaway]; and then I think [Dunaway’s trial counsel], and then they got into the panels.
“THE COURT: Prior to the striking of Gissendanner? I mean, do you know which was struck first?
“[DUNAWAY’S COUNSEL]: I want to say Dunaway was struck first. From the way I read the record, Judge, it looks like Dunaway was struck first. And I think some jurors did serve on both jur[ies],
“THE ■ COURT: Okay. Thank you, [L.L.].”[3]
As to Dunaway’s claim concerning L.L., the Rule 32 court’s order states:
“Dunaway contends juror [L.L.] did not disclose during voir diré that a member of her family was, a victim of a shooting. According to Dunaway, if [L.L.] had divulged this information, his trial counsel would have removed her by a for-cause challenge or by exercising a peremptory strike.
“... Dunaway’s [Rule 32 petition] counsel did not ask [Dunaway’s trial counsel] if they would have 'removed [L.ll.] if she had indicated she was rélat-ed' to a shooting victim. Further, [L.L.] indicated at the héaring that if she did not inform defense counsel arid the prosecutor one of her relatives was the victim of a shooting it was because' she was not asked or did not understand the question. In any event, [L.L.] affirmatively indicated that the fact her relative had been the victim of a' shooting did not affect her deliberations in Dunaway’s case and that she based her verdicts and sentencing recommendations on the evidence at trial and the trial court’s jury instructions.
“The Court finds- this allegation of juror misconduct is without merit. Rule 32.7(d), Ala. R.Crim. P. In the alternative, the Court finds Dunaway failed to meet his burden of proving by a preponderance of evidence that this allegation of juror misconduct might have caused *576 him to be prejudiced as required by Rule 32.3, Ala. R.Crim. P.”
(References to record from Rule 32 proceeding omitted.)
In addressing Dunaway’s claim as to L.L., the Court of Criminal Appeals stated:
“At the Rule 32 evidentiary hearing, L.L. testified that she had a family member who had been the victim of a shooting in the family member’s home; she did not identify the family member’s relationship to her. Dunaway pleaded in his consolidated petition that L.L.’s ‘cousin’ had been the victim of a violent crime.
“... The record indicates that during voir dire examination the entire venire was asked if they had a family member or a friend who had been the victim of a crime. L.L. did not respond to this question. Dunaway asserts that the jurors were asked three times if they had a family member who had been the victim of a crime. However, the venire was questioned in three panels and each panel was asked the same question. Postconviction counsel asked L.L. very few questions — her direct examination consists of approximately two pages of transcript. L.L. was not asked what her relationship was to the family member. Also, on cross-examination L.L. responded that she did not hear a question related to her family and that the fact that a family member had been the victim of a shooting had no impact on her verdict in Dunaway’s case. Also, Duna-way’s counsel were not asked whether they would have struck L.L. for cause had she answered the questions. We agree with the circuit court that Duna-way was due no relief in regard to juror L.L. because he failed to meet his burden of proof.”
Dunaway II, 198 So.3d at 539-40 (emphasis added).
According to Dunaway, the Court of Criminal Appeals’ decision denying his juror-misconduct claim as to L.L. conflicts with Ex parte Dobyne, 805 So.2d 763 (Ala.2001), Ex parte Ledbetter, 404 So.2d 731 (Ala.1981), and Ex parte Dixon, 55 So.3d 1257, 1262-63 (Ala.2010). We agree.
This Court stated in Dobyne:
“The proper standard fdr determining whether juror misconduct warrants a new trial, as set out by this Court’s precedent, is whether the misconduct might have prejudiced, not whether it actually did prejudice, the defendant. See Ex parte Stewart, 659 So.2d 122 (Ala.1993); Campbell v. Williams, 638 So.2d 804 (Ala.1994); Union Mortgage Co. v. Barlow, 595 So.2d 1335 (Ala.1992), cert. denied, 506 U.S. 906, 113 S.Ct. 301, 121 L.Ed.2d 224 (1992). The ‘might-have-been-prejudiced’ standard, of course, casts a ‘lighter’ burden on the defendant than the actual-prejudice standard. See Tomlin v. State, ... 695 So.2d [157,] 170 [ (Ala.Crim.App.1996) ]. For a more recent detailed discussion of the burden of proof required to make a showing under the ‘might-have-been-prejudiced’ standard, see Ex parte Apicella, 809 So.2d 865, 871 (Ala.2001) (‘It is clear, then, that the question whether the jury’s decision might have been affected is answered not by a bare showing of juror misconduct, but rather by an examination of the circumstances particular to the case.’ (Emphasis [on ‘might’] original.)).
“It is true that the parties in a case are entitled to true and honest answers to their questions on voir dire, so that they may exercise their peremptory strikes wisely. See Fabianke v. Weaver, 527 So.2d 1253 (Ala.1988). However, not every failure to respond properly to *577 questions propounded during voir dire ‘automatically entitles [the defendant] to a new trial or reversal of the cause on appeal.’ Freeman v. Hall, 286 Ala. 161, 166, 288 So.2d 330, 336 (1970).... As stated previously, the proper standard to apply in determining whether a party is entitled to a new trial in this circumstance is “whether the defendant might have been prejudiced by a venire-member’s failure to make a proper response.’ Ex parte Stewart, 659 So.2d at 124. Further, the determination of whether a party might have been prejudiced, i.e., whether there was probable prejudice, is a matter within the trial court’s discretion. Eaton v. Horton, 565 So.2d 183 (Ala.1990); Land & Assocs., Inc. v. Simmons, 562 So.2d 140 (Ala.1989) (Houston, J., concurring specially).
“ ‘The determination of whether the complaining party was prejudiced by a juror’s failure to answer voir dire questions is a matter within the discretion of the trial court and will not be reversed unless the court has abused its discretion. Some of the factors that this Court has approved for using to determine whether there was probable prejudice include: “temporal remoteness of the matter inquired about, the ambiguity of the question propounded, the prospective juror’s inadvertence or willfulness in falsifying or failing to answer, the failure of the juror to recollect, and the materiality of the matter inquired about.” ’
“Union Mortgage Co. v. Barlow, 595 So.2d at 1342-43 (quoting Freeman v. Hall, supra (other citations omitted))....
“The form of prejudice that would entitle a party to relief for a juror’s nondisclosure or falsification in voir dire would be its effect, if any, to cause the party to forgo challenging the juror for cause or exercising a .peremptory challenge to strike the juror. Ex parte Ledbetter, 404 So.2d 731 (Ala.1981); Warrick v. State, 460 So.2d 320 (Ala.Crim.App.1984); and Leach v. State, 31 Ala.App. 390, 18 So.2d 285 (1944). If the party establishes that the juror’s disclosure of the truth would have caused the party either to (successfully) challenge the juror for cause or to exercise a peremptory challenge to strike the juror, then the party has made a prima facie showing of prejudice. Id. Such prejudice can be established by the obvious tendency of the true facts to bias the juror, as in Ledbetter, supra, or by direct testimony of trial counsel that the true facts would have- prompted a .challenge against the juror, as in State v. , Freeman, 605 So.2d 1258 (Ala.Crim.App.1992).” .
Ex. parte Dobyne, 805 • So.2d at 771-73 (footnote omitted and some emphasis added).
' In Ex parte Dixon, this Court noted the following facts as being pertinent to the juror-nondisclosure issue in that case:
“... Dixon contends that L.A., who served as a juror at his trial, failed to respond correctly to the following question asked during voir dire of the venire:
. “ ‘Have you or a member of your immediate family ever been a criminal defendant in a criminal case in either the district court or the circuit court in this county where [the district attorney or any of his assistants] prosecuted the case?’
“L.A. did not respond to this question; however, criminal charges were pending against her at the time of Dixon’s trial. About two months before Dixon’s trial, L.A. had been twice charged by family members with a .misdemeanor. The charges had been served on L.A., and *578 she had posted an appearance bond in each case. About a week before Dixon’s trial, L.A.’s case- had been continued by the trial court. At the time of-Dixon’s trial, L.A. personally was engaged in discussing the disposition of the charges with the district attorney. Shortly after Dixon’s trial, L.A.’s ease was placed in pretrial diversion status.”
55 So.3d at 1259 (footnote omitted). We also noted that “Dixon’s trial counsel testified at the evidentiary hearing that, had he known of the pending charges, he would have challenged L.A. for cause or exercised one [of] his peremptory challenges to remove her.” 55 So.3d at 1263.
The trial court denied Dixon’s motion for a new trial grounded on the alleged prejudice resulting from L.A.’s nondisclosure. The Court of Criminal Appeals affirmed by an unpublished memorandum, concluding “that L.A,’s failure to disclose information about the criminal charges-pending against her was inadvertent, rather than willful,” and “that there was no prejudice to Dixon by L.A.’s failure to respond because she later testified that the fact that charges were pending against her did not affect her verdict.” 55 So.3d at 1260. On certio-rari review, this Court stated: ' ’
“[W]e conclude that the trial court exceeded its ‘discretion in denying Dixon’s motion for a new trial based on L.A.’s ■failure to disclose in response-to a question on voir dire that criminal charges were pending against her. An analysis of the Dobyne factors reveals that most of those factors indicate that Dixon was prejudiced by L.A.’s failure to respond.
“The matter was not temporally remote — the criminal charges had been filed less than two months before Dixon’s tria! and they were still pending at the time of Dixon’s trial.
“As to the ambiguity of the question propounded, we conclude that the question was sufficiently definite to require an affirmative response from L.A. At the evidentiary hearing on Dixon’s motion for a new trial, L.A. testified that her understanding of the question was such that it did not require an affirmative answer, but the record simply does not provide adequate support for this assertion. L.A. did not offer a single reason she would understand the question to not require an affirmative response; instead, she offered a shifting series of explanations for her failure to respond affirmatively to the question, including (1) that she had not been arrested, but had merely been ‘served papers,’ (2) that she was not aware that the charges were criminal charges because they related to a family dispute, (3) that the matter ‘wasn’t trouble with the law, it was a family member,’ and (4) that she knew that the charges were going to be dropped. Wé find these ‘hairsplitting’ explanations to be wholly inadequate, especially in light of -L.A.’s testimony that she herself had been negotiating with the district attorney about the disposition of those pending charges before Dixon’s trial and that she was aware that her case had been continued on April 3, 2007, approximately one week before the start of Dixon’s trial. 'At a minimum, the question was framed so as to require L.A. to mention the charges.
“Even if the question was ambiguous, however, the district attorney could have avoided the need for a new trial had he disclosed the fact of the pending charges when L.A. failed to respond affirmatively to the question. The district attorney himself was negotiating the disposition ■of L.A.’s cases, and the prosecutor in this case has never denied knowledge of the pending charges against L.A. Although various Alabama courts have held that the State does not have a *579 general obligation to disclose information on veniremembers, fairness dictates that the State cannot stand mute when a juror fails to respond , (or responds incorrectly) to a question on voir dire and the prosecutor is aware of the true facts.
“In Wright v. State, 678 So.2d .1216 (Ala.Crim.App.1996), the Court of Criminal Appeals reversed a conviction because one of the jurors failed to disclose a close family relationship with a staff member in the district attorney’s office, who was present in the courtroom. The court stated:
“ ‘We might have found [the juror’s] silence harmless and that the appellant suffered no prejudice ... were it not for the silence of [the staff member] .... [W]e find the appearance of probable prejudice- existed where both a member of the district attorney’s staff, who was seated at the prosecution’s table and who participated in jury selection, and a juror failed to disclose information inquired about during voir dire relevant to the defense in exercising its peremptory strikes.’
“678 So.2d at 1220. See also Tomlin [v. Slate ], 696 So.2d [157] at 176 [(Ala.Crim.App.1996) ] (juror failed to 'disclose pending drug-possession charge; there was no indication that prosecutors knew of the pending criminal charge," but ‘had the prosecutors known, we believe considerations of basic fairness would have created an affirmative duty on the part of the prosecutors to make the disclosure’); Berger v. United States, 296 U.S. 78, 87, 56 S.Ct. 629, 79 L.Ed. 1314 (1936) (‘while [a prosecutor] may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.’); Shields v. State, 680 So.2d 969, 974 (Ala.Crim.App.1996) (the ““prudent prosecutor will resolve doubtful questions in •favor of disclosure’ ” ’ (quoting Kyles v. Whitley, 614 U.S. 419, 439, 115 S.Ct. 1565, 131 L.Ed.2d 490 (1995), quoting in turn United States v. Agurs, 427 U.S. 97, 108, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976))).
“The materiality of L.A.’s failure to respond to the question and the prejudice to Dixon are evidenced by the testimony of Dixon’s trial counsel and by the nature of the information not disclosed. Dixon’s trial counsel testified at the evi-dentiary hearing that, had he known of the pending charges, he would have challenged L.A. for cause or exercised one his peremptory challenges to remove her. The direct testimony of Dixon’s trial counsel is prima facie evidence of prejudice to Dixon. ,
“Further, even in the absence of such testimony, the potential for juror bias is obvious under the present circumstances. As Jüdge Welch stated in his dissent to the Court ‘of Criminal 'Appeals’ unpublished memorandhm:
“ ‘Certainly it would be a serious concern if a prospective juror was subject to the discretionary decisions of the district attorney. Human nature being what it is, it would have, been natural for defense counsel to be suspicious about a juror who was behol.den to the State, and to be reluctant to take the chance that the. juror might be biased and wanting to curry favor with the State by voting to convict. Indeed, trial counsel testified that had L.A. been truthful he would have attempted to strike her. for cause, and, failing that, he would have exercised a peremptory challenge and struck her from the venire.’
*580 “[Dixon v. State ] 55 So.3d [1250,] 1254 [ (Ala.Crim.App.2008) (Welch, J., dissenting) ]. See also Tomlin, 695 So.2d at 175 (juror’s failure to disclose pending charge of possession of cocaine warranted reversal of conviction).
“The State contends that the presumption of prejudice was rebutted by L.A.’s testimony at the hearing on Dixon’s motion for a new trial that the fact that she had pending criminal charges against her did not affect her verdict. The State’s contention is based upon L.A.’s negative response when asked whether her verdict was prejudiced by circumstances relating to the pendency of the criminal charges against her. The State cites no authority and makes no legal argument to support the assertion that the presumption of prejudice can be rebutted merely by a juror’s con-clusory statement that his or her verdict was not affected by the potential source of bias. In any event, the juror’s own testimony as to his or her impartiality in rendering a verdict does nothing to rebut evidence that trial counsel would have challenged the juror for cause or would have used a peremptory challenge to strike that juror had the juror responded truthfully to the question. The point of peremptory challenges is to reduce the effect of hidden or unconscious biases. See Bruner v. Cawthon, 681 So.2d 173 (Ala.1996) (Maddox, J., concurring in the result) (discussing possible use of written questionnaires to ‘disclose hidden prejudices that the juror might not even suspect he or she has’); Ex parte Branch, 526 So.2d 609, 628 (Ala.1987) (discussing role of peremptory challenges in identifying and excluding jurors likely to be biased against a party).
“Dobyne is distinguishable from the present case as to prejudice. The juror in Dobyne failed -to disclose that many years before Dobyne’s trial she had had some limited contact with the defendant in her capacity as a special-education coordinator.' She testified at the defendant’s Rule 32, Ala. R.Crim. P., hearing that she did not remember the defendant. The trial court found that no prejudice had occurred. Dobyne’s trial counsel testified at the Rule 32 hearing, but he did not state that he would have challenged the juror if he had known of the relationship. He also testified that, other than the juror’s prior contact with the defendant, he considered her to be a desirable juror. This Court concluded that there was no érror in the trial court’s rejection of the defendant’s juror-misconduct claim.
“In the present case, we conclude that the juror’s bare assertion of impartiality is not sufficient to rebut the prima facie evidence, both direct and inferential, that Dixon was prejudiced by her failure to disclose her pending criminal charges. As Judge Welch stated in his dissent:
“‘It would seem to me that it is intellectually dishonest to pretend that Dixon was not prejudiced by L.A.’s silence. The record clearly reflects that at the time of voir dire L.A. was a criminal defendant* who for all practical purposes was in the middle of negotiating a plea agreement with the State. I believe that it would be difficult for a juror in L.A.’s position to be unbiased. I certainly do not believe that we can presume, despite L.A.’s protest to the contrary, that she was unaffected by her relationship with the State.
. Jurors know that it is their job to be fair and to avoid prejudice and bias. They are so instructed during the court’s oral charge. After a trial, asking a juror if her verdict *581 was affected by anything that would reflect on her ability to be fair, especially after that juror has been thoroughly questioned by defense counsel, is extremely unlikely to elicit a positive response. In essence the juror would have to admit her misconduct or bias in open court and to testify that she intentionally disregarded her ■ duty to be fair. The juror would be unfamiliar with what would be the personal consequences of such an admission and might very well fear that she would be held in contempt or charged with a crime such as obstruction of justice if she admitted that her verdict was tainted by her bias. For these reasons it is unwise to place great weight on an answer affirming a lack of bias.’
“55 So.3d at 1254-55.
“Therefore, we conclude that L.A.’s failure to disclose the pending criminal charges was material and that Dixon was prejudiced by L.A.’s failure to disclose those charges and her ongoing negotiations with the district attorney’s office at the very time of Dixon’s trial. Even if L.A. honestly believed that those charges would not affect her decision, the legal standard for bias is unquestionably met in this case. Further, we conclude that the prejudice was sufficient to warrant a new trial, particularly in view of' the fact that the district attorney could easily have avoided the necessity for a new trial by disclosing the pending charges.”
55 So.3d at 1261-65 (emphasis added; emphasis omitted; footnotes omitted).
It is clear from the testimony and evidence presented in the Rule 32 proceeding that L.L. was particularly close to a family member, identified as L.L.’s cousin, who, like one of the victims here, was shot by a male assailant in her home. L.L. was on the jury pool for both Dunaway’s case and the case against her cousin’s alleged assailant, which were scheduled to be tried the same week. The jury on which L.L. served for purposes of the Dunaway case was struck on the same day as the jury for the case against her cousin’s alleged assailant.[4] In fact, at the end of voir dire on the day before Dunaway’s trial, the prospective jurors for both cases were seated together in the courtroom when the court called out the names of the jurors for each case. The names of the jurors who had been selected for the case against the cousin’s alleged assailant were called first, and they were told to return for trial on Thursday of that week; the names of the jurors for Dunaway’s case were then called, and they were told to return for trial the following morning. Nonetheléss, L.L. failed to provide a truthful answer on her written questionnaire and to oral questions as to her knowledge of family or friends who had been the victim of a crime.
Despite these troubling facts, the Court of Criminal Appeals agreed with the conclusion of the Rule 32 court that Dunaway did not meet his burden of proving that he might have been prejudiced by L.L.’s failure to disclose that a family member had *582 been the victim of a violent crime.' In reaching this conclusion, the Court of Criminal Appeals emphasized the fact that Dunaway’s Rule 32 counsel did not ask his trial counsel if they would have stricken L.L. from the jury had they known she was related to a shooting victim.
We have repeatedly recognized that prejudice in such a case is not measured by the likelihood that the questionable juror did in fact alter his or her verdict based on. the undisclosed facts (something that can be difficult even for the juror to assess, much less for a defendant to prove after the fact). Rather, the prejudice concerns the fairness of the trial process. Specifically, “[t]he form of prejudice that would entitle a party to relief for a juror’s nondisclosure or falsification in voir dire would be its effect, if any, to cause the party to forgo challenging the juror for cause or exercising a peremptory challenge to strike the juror.” Ex parte Dobyne, 805 So.2d at 772.[5] Moreover, such prejudice can be established by direct testimony of trial counsel or “by the obvious tendency of the true facts to bias the.juror.” 805 So.2d at 773 (citing Ex parte Ledbetter). Thus, the focus of the Court of Criminal Appeals on the lack of testimony by Dunaway’s trial counsel fails to take adequate account of the obvious potential for bias in this case given (1) the “close” relationship L.L. had with her cousin, (2) the similarities between the two crimes— both involving the shooting of a female in her home by a male, (3) the fact that the crime against L.L.’s cousin occurred within two weeks of the crime Dunaway was charged with, and (4) the fact that proceedings relating to the trial of L.L.’s cousin’s attacker were commenced contemporaneously with the Dunaway’s trial proceedings. The likelihood that the absence of these facts caused Dunaway’s counsel to forgo a challenge to L.L. that he otherwise would have made is obvious. In addition, we have in this case the fact that Duna-way’s trial counsel1 struck the majority of prospective jurors who disclosed that a family. member had been the victim of a crime.
The Ex parte Dobyne Court recited five factors that have been used to determine whether probable prejudice existed as a result of a juror’s failure to disclose:
(1) the temporal remoteness of the matter inquired about;
(2) the ambiguity of the question propounded;
(3) the prospective juror’s inadvertence or willfulness in falsifying or failing to answer;
(4) the failure of the juror to recollect; and
(5) the materiality of the matter inquired about.
805 So.2d at 772. In this case, all five of those factors arguably support a finding of *583 probable prejudice. The Court of Criminal Appeals, however, attempts to buttress its conclusion by emphasizing the third factor — the possible inadvertence of the juror’s false answer. They point out that, on cross-examination, L.L. stated that the reason she did not volunteer the information is that she did not hear a question related to her family. Aside from the fact that inadvertence or willfulness is only one of the five factors at issue, the Court of Criminal Appeals’ conclusion as to this factor ignores the fact that L.L. unquestionably answered incorrectly a similar question on her written questionnaire. In addition, she was asked essentially the same question at least twice during oral voir dire.
Moreover, in his brief on appeal, Duna-way aptiy provides the following further response to the inadvertence/willfulness factor:
“[T]his Court has held that á juror’s inadvertence in failing to answer voir dire questions does not eliminate prejudice:
“ ‘Our courts have held that the concealment by a juror of information called for in voir dire examination need not be deliberate in order to justify a reversal, for it may be unintentional, but insofar as the resultant prejudice to a party is concerned it is the same.’
“Sanders v. Scarvey, [284 Ala.215,] 224 So.2d 247, 251 (Ala.1969) (finding prejudice where jurors failed to reveal that they had brought suit in a personal injury case). Similarly, in Alabama Gas Corp. v. American Furniture Galleries. Inc., 439 So.2d 33 (Ala.1983), this Court stated:
“‘Nevertheless, if the failure to answer was prejudicial to the inquiring party, the result is the same as if it had been deliberate. Parties have the right to have questions answered truthfully so that they may exercise their discretion wisely in the use of their peremptory strikes, and that right is denied when a juror fails to answer correctly. And when the circumstances disclose that such a failure probably prejudiced the complaining party, in the trial -court’s discretion, its grant, of a new trial will not be reversed.’
“Id. at 36; see also Leach v. State, [31 Ala.App. 390,] 18 So.2d 285, 286 (Ala.1944) (‘Whether such concealment was deliberate or unintentional, on the part of the juror, need not be considered, insofar as the resultant prejudice to. defendant be concerned.’).”
Thus, the possibly inadvertent nature of L.L.’s nondisclosure does not foreclose the probability of prejudice resulting from the nondisclosure..
The parties in a case are entitled to true and honest answers to their questions on voir dire. See Ex parte Dobyne, supra. The fairness of our jury system, particularly in criminal cases, depends on such answers. Dunaway, no less than any other accused defendant, was entitled to that procedural fairness.

B. Claims as to E.B., M.B., and V.S.

Dunaway asserts that jurors E.B. and V.S. and alternate juror M.B. each failed to disclose- during voir dire that she had some previous relationship with Boyd Whigham, the district attorney who prosecuted Dunaway. We have carefully considered Dunaway’s claims as to V.S. and M.B. and conclude they are without merit. Dunaway’s claim as to E.B., however, has merit, and, as to that claim, his petition was due. to be granted by the . Rule 32 court.
*584 Dunaway contends that E.B. failed to disclose that Whigham had previously represented her in a custody dispute related to her granddaughter, that this past relationship constitutes evidence that Duna-way might have been prejudiced by E.B.’s presence on the jury, and that E.B.’s failure to reveal the information constitutes a ground for a new trial.
The “Juror Information Questionnaire” completed by E.B. contained no response to question no. 24: “If you now know, or if you have known, anyone in any District Attorney’s office, probation and parole department, police department or ... correctional office, please supply the person’s name and the agency for which he or she works or did work.” In addition, E.B. did not respond when Whigham asked during oral voir dire whether any of the prospective jurors was a former client of his.
E.B.’s testimony at the Rule 32 hearing is as follows:
“Q., And was Boyd Whigham the district attorney in [Dunaway’s] case?
“A. Yes..
“Q. Prior to your jury service, did you know Mr. Whigham?
“A. Yes, I did.
“Q. And has he ever done any legal work for you?
“A. Yes. He won custody of my granddaughter.
“Q. And how old was your granddaughter at the time you got custody of her?
“A. She was thirteen months.
“Q. How old is your granddaughter now?
“A. Nineteen.
“Q. After you got custody of your granddaughter, where did she live?
“A. She lived in the house with me.
“Q. And how long did she live with you?
“A. Until she got sixteen.
“Q. Who raised your granddaughter?
“A. I did.
“Q. Did you ever meet with Mr. Whig-ham to talk about this custody case?
“A. Yes. Just before he won custody of her, we had to go to the office and speak with him.
“Q. Did the case go to trial?
“A. Yes, it did.
“Q. Were you asked to testify in that case?
“A. Just for a little — a few words.
“Q. And why did your family choose to have Mr. Whigham represent you in this case?
“A. Well, we knew him to be a good lawyer.
“Q. And how did he do in your case?
“A. He did very well,”
(Emphasis added.) On cross-examination, E.B. testified as follows:
“Q. Did you hire Mr. Whigham to do your child custody matter about your granddaughter or did someone else do that?
“A. My son did.
“Q. So your son was the man that paid Mr. Whigham his fee?
“A. Yes.
“Q. And you say your granddaughter is nineteen years old now?
“A. Yes.
“Q. So would it be about 1985 when this happened, this child custody matter came up?
“A. Yes.
“Q. [E.B.], the fact that Mr. Whigham was the attorney in the child custody case, did that have any bearing at all *585 on your sitting as a juror in Larry Dunaway’s case?
“A. No.
“Q. Okay. Did you base your verdict and your sentence recommendations on the evidence you heard here in the . courtroom and the law that Judge Gaither told you to?
“A. Yes.”
On redirect examination, E.B. testified as follows:
“Q. How old was your son — When was your son born?
“A. In ’63.
“Q. Did he live with you at the time of the custody trial?
“A. Yes.”
The Rule 32 court’s order denying Dun-away’s claim as to E.B. states:
“Dunaway contends juror [E.B.] did not disclose in her juror questionnaire she knew Boyd Whigham, the Barbour County District Attorney, before trial. According to Dunaway, Mr. Whigham ‘provided legal assistance in a child custody suit regarding her granddaughter during the 1980s.’ (Consolidated petition on p. 7) According to Dunaway, if [E.B.] had divulged this information, his trial counsel would have removed her by a for-cause challenge or by exercising a peremptory strike.
“... Dunaway’s [Rule 32 petition] counsel did not ask [his trial counsel] if they would have removed [E.B.] if she had disclosed this information. Further, at the evidentiary hearing, [E.B.] indicated Whigham’s' prior representation had no bearing at all on her ability to sit on Dunaway’s case. According to [E.B.], she based her verdicts and sentencing recommendations on the evidence presented at Dunaway’s trial.
“... The Court finds this allegation of juror misconduct is without merit. Rule 32.7(d), Ala. R.Crim. P. In the alternative, the Court finds Dunaway failed to meet his burden of proving by a preponderance of evidence that this allegation of juror misconduct might have caused him to be prejudiced as required by •Rtile 32.3, Ala. R.Crto. P.”
The Court of Criminal Appeals addressed Dunaway’s claim as to E.B. by noting:
“The record indicates that the jury was asked if the district attorney had previously represented any one of them while he was in private practice. Juror E.B. did not respond. During the post-conviction hearing E.B. said that in . the early 1980s her ‘son’ had retained Whig-ham to represent him in a custody dispute involving her granddaughter. She said that Whigham’s representation of her son had no bearing on her verdict in Dunaway’s case.
“There is no indication that the circuit court abused its considerable discretion in denying Dunaway relief on his claims related to juror[ ] E.B. ...”
198 So.3d at 541-42.
We. first note that the State argues that E.B.’s failure to respond .was truthful because she was not a client of Whigham’s; her son retained and paid Whigham. The State’s argument, however, is incorrect, .as is the Court of Criminal Appeals’ conclu: sion that Whigham represented E.B.’s son in the custody proceeding. The fact that E.B.’s son retained and paid Whigham does not establish that E.B. was not Whig-ham’s client in the custody proceeding. Indeed, E.B. affirmed during her examination that Whigham did the legal work for her and that her family chose “to have Mr. Whigham represent [her]” because they knew he was a good attorney. She was the person who obtained custody of the *586 grandchild, not her son; there is no evidence indicating that Whigham represented E.B.’s son in the custody proceeding or that E.B. was not represented by Whig-ham in that proceeding. Furthermore, even if we could exclude consideration of Whigham’s representation of E.B., there is still the significant matter of her failure to truthfully answer the written question in her questionnaire regarding whether she knew the district attorney.
Also, as with the alleged misconduct of L.L., the Court of Criminal Appeals’ observation that Dunaway’s Rule 32 counsel did not ask his trial counsel whether he would have challenged E.B. had he known about the undisclosed information gives short shrift to the “obvious tendency” of the relationship to create bias and to' have made it likely that, had they known of the relationship, counsel for Dunaway would have struck E.B. from the jury. As Duna-way notes: “The attorney-client relationship is similar to the doctor-patient relationship in that it is a ‘close, personal relationship built upon trust and confidence.’ ” (Quoting Boykin v. Keebler, 648 So.2d 550, 552 (Ala.1994).) Whigham helped E.B. to obtain custody of her granddaughter, and, as a result of Whig-ham’s work, E.B. was able to raise her granddaughter in her own home. E.B. testified that Whigham “did very well” for her family in winning the custody dispute. The materiality of the question regarding whether any prospective juror had been represented by the district attorney in the past is obvious, and the- nature of Whig-ham’s representation of E.B. — a custody dispute over E.B.’s granddaughter — obviously implicates personal emotions. It takes no leap of imagination to assume that E.B. carried a favorable opinion of Whigham based on his representation of her when he was in private practice and that this opinion could have biased her view of Dunaway’s case.[6]
Moreover, the observation of the Court of Criminal Appeals ignores the fact that Dunaway’s trial counsel repeatedly sought information concerning whether prospective jurors previously had ties to the district attorney. Dunaway’s trial counsel filed a “Motion to Require Disclosure of Any and All Information Concerning Prospective Jurors that may be Favorable to Defense.” This motion sought any information regarding a prospective juror’s fitness and cited the district attorney’s “long association” with Barbour County. Duna-way’s trial counsel also filed a “Motion to Disclose the Past and Present Relationships, Associations and Ties Between the District Attorney and Prospective Jurors,” which sought disclosure of all relationships or associations with prospective jurors. During discussions between the trial court, Whigham, and Dunaway’s counsel after the venire had been assembled and while the prospective jurors were completing the “Juror Information Questionnaire,” Duna-way’s counsel specifically noted the filing *587 of the' aforementioned motions. Duna-way’s counsel stated that he was seeking information of- “any ties between the district attorney and prospective jurors,... You know, we will be able to ask the jurors the things which — . As you know, sometimes jurors don’t respond.” (Emphasis added.) The trial court granted the motions.
Thereafter, during oral voir dire, Whig-ham stated:
“[A]nd I have practiced here for a number of years. Some of you have been my clients over the years and some of you might have been their clients over the years. And they have a right to know that... If you .were a client of mine at any time, if you mil please raise your hand.so they would know it.”
(Emphasis added.) Several prospective jurors responded to: the question, and Whigham eyen called out the name of one prospective juror he apparently knew, though it is unclear whether,.that prospective juror had responded to the question. Nevertheless, as noted above, E.B. did not respond to Whigham’s question, just as she did not respond to question no. 24 on the “Juror Information Questionnaire” that asked every prospective juror whether he or she knew the district attorney.[7]
The facts not disclosed to Dunaway regarding the district attorney’s prior representation of E.B. in a child-custody dispute are of a nature that would “tend[ ] ... to bias the juror” and generate a challenge or other , strike of that prospéc-five juror. In addition, of the five prospective jurors who- did respond on. voir dire that they had been clients of the district attorney, four of them were in fact stricken.[8] Thus, -given the nature of the undisclosed relationship, the emphasis Dunaway’s trial counsel clearly placed on discovering relationships between' the dis-' trict attorney and the prospective jurors, and the fact that his counsel challenged most of the prospective jurors' who accurately answered the question, - it is' no stretch to assume that the information E.B. did not disclose would have been important to Dunaway’s trial counsel in determining whether to challenge E.B. as a juror.
Again, we note that the parties in a case are entitled to true and honest answers to their questions on voir- dire. See Ex parte Dobyne, supra.
III. Conclusion
Although the crimes of which Dunaway has been accused are horrendous, that fact does not alter Dunaway’s right to a fair trial, for by definition it is only through a trial that comports with constitutionally required principles that our criminal-justice system can declare an. accused such as Dunaway guilty of such a crime and, if necessary, determine the appropriate punishment. Dunaway, no less than any other defendant, is entitled to a process characterized by constitutional fairness before he is found guilty.
*588 In sum, the failure of disclosure relating to.L.L. and-E.B. in this case “ ‘ “rendered] hollow [Dunaway’s] right of peremptory challenge.” ’ ” Dixon, 55 So.3d at 1261 (quoting Tomlin, 695 So.2d at 169, quoting in turn Knight v. State, 675 So.2d 487, 494 (Ala.Crim.App.1995)). Dunaway’s petition insofar as the claims as to L.L. and E.B. was due to be granted. We reverse the judgment of the Court of Criminal Appeals and remand the case to that court for proceedings or an order consistent with this opinion. We pretermit any discussion as to Dunaway’s Brady claims and ineffective-assistance-of-counsel claims.
REVERSED AND REMANDED,
STUART, PARKER, SHAW, and BRYAN, JJ., concur.
BOLIN, J., concurs in the result.
MOORE, C.J., dissents.
MAIN and WISE, JJ., recuse themselves.*

. In the opinions of the Court of Criminal Appeals and this Court on direct appeal, Dun-away is referred to as "Larry D. Dunaway, Jr.” In the Court of Criminal Appeals’ opinion in this Rule 32 proceeding, he is referred to as "Larry Dunaway.” Both names appear in the record of both the direct appeal and the Rule 32 proceedings.

. The jury voted 10-2 in favor of a death sentence for the murder of James Patterson and 7-5 in favor of life imprisonment without the possibility of parole for the murder of Tressa Patterson. The trial court followed the jury’s sentencing recommendations.

. Voir dire was conducted as to Dunaway’s case first. Notwithstanding the order of voir dire, Dunaway asserts that he proved at the Rule 32 hearing that, on the very same day that L.L. represented in Dunaway's case that no one in her family had ever been a victim of a crime, she was excused from jury service in an attempted-murder case in the same courthouse because' she was a family member of the victim. In support of this argument/ Dun-away refers to L.L.’s testimony at the Rule 32 hearing and to a copy of the juror-strike list from a criminal case against Lorenzo Gissen-danner; L.L.’s name is crossed through on the strike list, which was offered as an exhibit at the. Rule 32 hearing. The State points out in its brief that the testimony and document Dunaway references.do not indicate the reason L.L.’s name was struck, whether,.her name was struck during or before voir dire in that case, or whether the prosecutor" was aware of L.L.’s background based on the voir dire that occurred in Gissendanner’s case.
We also note that, in paragraph 81 of his amended Rule 32 petition, Dunaway asserted that certain of his constitutional rights were violated when prospective jurors were allegedly improperly exposed to questioning about another case. In the context of this assertion,. Dunaway states that "a second jury was chosen almost simultaneously with his.”

. As noted above, voir dire in Dunaway’s case occurred first. There is no evidence in the record indicating that Dunaway’s counsel was present when oral voir dire was conducted in the case involving L.L.’s family member. The record does not contain a clear indication that District Attorney Whigham was present for the latter voir dire, though it appears he was the prosecutor in that case. Nevertheless, we note that Dunaway’s oral voir dire began, like most such voir dires, with questions to the jurors about whether they knew any of the counsel, parties, or witnesses in the case. We need not assume whether voir dire in the case in which L.L.’s close family member was a victim included such a question, because L-L. testified that “I was dismissed because I was related to [S.S.].”

. The Court of Criminal Appeals also observed that L.L. testified that the fact that a family member had been the victim, of a shooting had no impact on her verdict in the Dunaway trial. As noted, Ex parte Dixon fully explained why such testimony was not an adequate response to the procedural prejudice at issue and even can be suspect. See Ex parte Dixon, 55 So.3d at 1264. Other cases have expressed similar concerns. See Wood v. Woodham, 561 So.2d 224, 228 (Ala.1989) (stating that "the simple extraction of an affirmative" response from a potential juror does not necessarily absolve that juror of probable prejudice”); Wright v. Holy Name of Jesus Med. Ctr., 628 So.2d 510, 512 (Ala.1993) (patient of doctor-defendant should have been removed despite statement that relationship would not "sway” her verdict); and Dixon v. Hardey, 591 So.2d 3, 7 (Ala.1991) (although juror did not admit bias, "to disregard her apprehensions would be to ignore the realities of human nature”) (abrogated by Bethea v. Springhill Mem'l Hosp., 833 So.2d 1, 6-7 (Ala.2002)).

. Dunaway, has cited several cases from other jurisdictions that support such a conclusion. See Fugate v. Commonwealth, 993 S.W.2d 931, 938-39 (Ky.1999) (trial court erred in denying for-cause challenge of two jurors who had previously been represented by prosecuting attorney, and who stated that they were satisfied with their representation); State v. Hatley; 223 W.Va. 747, 751-52, 679 S.E.2d 579, 583-84 (2009) ("In many West Virginia communities, prospective jurors. will often know the parties and their attorneys. Nevertheless, this familiarity does not remove the trial court’s obligation to empanel a fair and impartial jury .... This obligation includes striking prospective jurors who have a significant past or current relationship with a party or a law firm.”); O’Dell v. Miller, 211 W.Va. 285, 291, 565 S.E.2d 407, 413 (2002) (trial court erred in refusing to, strike for cause juror who had been defendant’s patient and who was currently represented by law firm representing defendant).

. In response to the foregoing motions and discussion and the trial court’s granting of those motions, the district attorney did not disclose a prior relationship with E.B. The record contains no direct evidence indicating whether Whigham did or did not remember E.B. as a former client. The State obtained an affidavit from Whigham for purposes of the Rule 32 hearing; however, in that affidavit, of the four jurors at issue in this appeal, Whigham mentioned only M.B., stating as to her only that, at the time of Dunaway's trial, he did not remember a “divorce filing” for her. . ,

. Dunaway’s trial counsel struck three of the prospective jurors; the State struck .one of the other two prospective jurors. The fifth-prospective juror had been a client of both trial counsel.